```
             IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA


ERIC ROONEY, et al.,        :    CIVIL ACTION
                            :    No. 06-3480
        Plaintiffs,         :
                            :
v.                          :
                            :
CITY OF PHILADELPHIA,       :
et al.,                     :
                            :
        Defendants.         :
```

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                         APRIL 22, 2009

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . -3-
   A. Facts . . . . . . . . . . . . . . . . . . . . . . . . -3-
       1.   Plaintiffs' proofs . . . . . . . . . . . . . . -4-
            a.   John E. Tesoriero's  expert report . . . -4-
            b.   Michael T. Di Camillo's deposition testimony-6-
            c.   Clifford Brown's deposition testimony . . -7-
       2.   Defendants' proofs . . . . . . . . . . . . . . -9-
            a.   Mark Rosencranz's and Craig Benedict's expert
                 report
                 . . . . . . . . . . . . . . . . . . . . . -9-
            b.   Dr. Lowell Krawitz's expert report . . . -10-
            c.   David H. Fleisher's expert report . . . -12-
   B. Procedural History . . . . . . . . . . . . . . . . -14-

II. ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . -14-
   A.   Rule 56(c) Standard . . . . . . . . . . . . . . . -14-
   B.   The City's Motion for Summary Judgment . . . . . -15-
   C.   SEPTA's Motion for Summary Judgment . . . . . . . -25-
       1.   Whether sovereign immunity bars Plaintiffs' claim
            for negligent maintenance or construction of the
            Bridge and the adjacent tracks or negligent
            maintenance or construction of the sewer system-25-
       2.   Whether SEPTA owed a duty to Plaintiffs  . . -32-
       3.   Whether Mr. Tesoriero's expert report should be
            excluded
            . . . . . . . . . . . . . . . . . . . . . . . -33-
   D.   Whether Plaintiffs' Strict Liability and Injunctive
        Relief Claims Against the City and SEPTA Are Barred by
        Sovereign Immunity
        . . . . . . . . . . . . . . . . . . . . . . . . . -37-
   E.   AMTRAK's Motion for Summary Judgment . . . . . . -39-

1.   Federal preemption . . . . . . . . . . . . -39-
     a.   Subject matter jurisdiction . . . . . . -39-
     b.   Whether Plaintiffs' claims are preempted by
          the Federal Railroad Safety Act . . . . -39-
     c.   Complete preemption doctrine . . . . . -48-
2.   Whether AMTRAK is liable for negligent maintenance
     or construction of the sewer system  . . . . -50-

III. CONCLUSION . . . . . . . . . . . . . . . . . . -51-

Plaintiffs Eric Rooney ("Rooney"), Woodbine Auto, Inc. ("Woodbine"), Lawrence Tobin ("Tobin"), and James Wysong ("Wysong," and collectively referred to as "Plaintiffs") brought this lawsuit against Defendants City of Philadelphia (the "City"), Southeastern Pennsylvania Transportation Authority ("SEPTA"), National Railroad Passenger Corporation ("AMTRAK"), and Consolidated Rail Corporation[1] (collectively referred to as "Defendants").  Plaintiffs' claims arise out of water damage to their residences and places of businesses resulting from a flood. Accordingly, they seek relief under the following theories against each Defendant: (1) negligence; (2) strict liability; (3) nuisance.[2]  The City, SEPTA, and AMTRAK move for summary judgment under Fed. R. Civ. P. 56(b).  (Doc. nos. 76, 77, 79.)  For the reasons that follow, (1) the City's motion for summary judgment is granted in part and denied in part; (2) SEPTA's motion for summary judgment is granted; and (3) AMTRAK's motion for summary

_____

[1]   Consolidated Rail Corporation was dismissed by way of joint stipulation.

[2]   Plaintiffs plead injunctive relief as a separate count. An injunction is not a cause of action, but rather it is a form of relief.

judgment is granted.  Accordingly, only Plaintiffs' negligence claim against the City may proceed to trial.


I. BACKGROUND

    A. <u>Facts</u>[3]

       On August 1, 2004, a severe rain storm caused fourteen feet of water to accumulate under the Woodbine Avenue Bridge (the "Bridge") located at 62nd Street and Woodbine Avenue (the "intersection") in Philadelphia, Pennsylvania.  According to Plaintiffs, the water accumulated on the date of the storm because the sewage drains that serve the intersection were clogged.  Plaintiffs allege that as much as one foot of mud and ballast in certain locations blocked the sewage drains.  As a result, the water flooded the adjacent area thereby causing extensive damages to Plaintiffs' properties and businesses. Plaintiffs claim two main factors caused the flood: (1) the artificially created runoff pattern from the railroad tracks and the area adjacent to the tracks; and (2) a failure to clean and maintain the sewage drains.  Pls.' Resp. Def. AMTRAK's Mot. Summ. J. 7-8 (doc. no. 83).

       The City acknowledges ownership of the sewage drains. Def. City's Mot. Summ. J. 4 (doc. no. 76).  However, the City

_____

    [3]    Unless otherwise indicated, all facts are taken from Plaintiffs' amended complaint.  (Doc. no. 28.)

avers that the "sewer system was filled beyond its capacity and
back-flowed . . . [beyond what] it could . . . have been designed
to handle, causing hydraulic pressure to build up within the
system." Id. at 4-5.  AMTRAK acknowledges ownership and
maintenance responsibility for the Bridge and the railroad tracks
at the intersection in the form of a railroad right of way.
AMTRAK's Ans. ¶ 10 (doc. no. 33).  On the other hand, SEPTA
denies ownership or other interest in the sewage drain, the
Bridge, and the area adjacent to the tracks.  SEPTA's Mot. Summ.
J. 5 (doc. no. 77).  Accordingly, SEPTA also denies
responsibility for the maintenance thereof.  Id.

     1.  Plaintiffs' proofs

        a.  John E. Tesoriero's  expert report

Plaintiffs' expert, John E. Tesoriero, P.E., P.P. ("Mr.
Tesoriero"),[4] prepared a report regarding the August 1, 2004
incident.  Pls.' Expert Report.  In preparing his expert report,
Mr. Tesoriero specifically considered the following: (1)
Plaintiffs' amended complaint; (2) a site specific weather
analysis report by CompuWeather dated June 11, 2008; (3) vhs

---

    [4]    Mr. Tesoriero is licensed as a professional engineer in
New Jersey, New York, and Pennsylvania, a professional planner
and a wastewater collection system operator in New Jersey, and
BOCA certified and New Jersey licensed RCS building inspector.
Mr. Tesoriero has a bachelor of science in civil engineering from
Drexel University (1979).  He is currently the president of Tesco
Engineering, Inc.

video titled "Glenn News Footage 2004 Flood"; (4) several hundred photographs from various unidentified sources documenting incident flooding and cleanup; (5) Mapquest.com website maps and aerial photographs; and (6) two site inspections in June of 2008. Id. at 2.

Mr. Tesoriero found that on August 1, 2004, between the hours of 6:45 a.m. and 11:00 a.m., 4 inches of rain fell in the area, which was classified as a "2 - 5 year rainfall event." Id. at 2-3. This classification was made considering rainfall "occurring within a 24 hour period . . . ." Id. at 3. There were two previous events within a ten-year period where 5.58 (September 16, 1999) and 5.10 (July 12, 2004) inches of rain fell in the area. Id.

The report also charged Defendants with notice by identifying a 3.75 inch rainfall event on July 10, 1994, which resulted in flooding and damages to the same area in question. Id. The July 10, 1994 event led to a lawsuit by Rooney, Woodbine, and others against SEPTA, Consolidated Rail Corp., AMTRAK, and the City. Id.[5]

Mr. Tesoriero concluded that at the time of the August 1, 2004 incident:

> [t]he stormwater [sic] runoff was laden with stone
> ballast from the railroad track base soils which

---

[5] Woodbine Auto, Inc. v. S.E. Pa. Trans. Auth., 8 F. Supp. 2d 475 (E.D. Pa. 1998).

> subsequently clogged the stormwater [sic] collection
> system inlets within Woodbine Avenue causing the inlets
> to become defective and create the flooding condition
> of the roadway.  This in turn caused the flooding
> damages incurred by Plaintiffs.

Id.  Mr. Tesoriero concluded that Defendants were liable for the

damages caused by the storm.  Id. at 3-4.  He also opines that at

the time of the August 1, 2004 incident: (1) the City "owned,

controlled, operated and maintained the incident related Woodbine

Avenue stormwater [sic] collection system"; and (2) SEPTA,

AMTRAK, and CONRAIL "jointly and or separately controlled, owned,

constructed, operated and maintained the [Bridge] crossing and

adjacent track laden defective property that was a significant

contributing cause of the Plaintiffs [sic] complained about

damages."  Id. at 3-4.


        b.   Michael T. Di Camillo's deposition testimony

        Michael T. Di Camillo ("Mr. Di Camillo"), senior

program manager of the engineering, maintenance, and construction

division at SEPTA, was deposed on May 21, 2008.  Mr. Di Camillo

testified about SEPTA's Overbrook maintenance facility located

south east of the intersection.  The facility was purchased from

AMTRAK and is now used to service SEPTA's rail cars.  Di Camilo

Dep. 11:8, 12:3, May 21, 2008.

        The facility is parallel to existing tracks and can be

accessed by using a "turnout," which "is a divergence of the rail

-6-

into another track." Id. at 13:10-16.  AMTRAK constructed two
turnouts from the existing tracks to the facility because the
"turnout[s] [were] on AMTRAK's property." Id. at 13:19-22.  One
of the turnouts was constructed at the Bridge. Id. at 14:7-10.
SEPTA actually paid AMTRAK to build the turnouts, presumably as
part of the transaction. Id. at 16:8-15.  According to Mr. Di
Camillo, SEPTA is entitled to use the tracks in the area, but
AMTRAK owns and maintains them. Id. at 20:22-24, 21:12-23.

        c.   Clifford Brown's deposition testimony

        Clifford Brown ("Mr. Brown"), Crew Chief Two at the
Philadelphia Water Department (the "Water Department"), testified
on June 4, 2008.  Brown Dep. 5:13-17, June 4, 2008.  Mr. Brown
supervises the mechanical and manual cleaning of the sewage
system in West Philadelphia, which includes the intersection.
Id. at 6:10, 7:21-23.

        He testified that the Water Department does not have a
procedure or policy dictating the frequency to which the sewers
must be cleaned. Id. at 9:2-20.  However, Mr. Brown said that
the Water Department "tr[ies] to [clean] [the] inlet[s] at least
once or twice a year . . . ." Id. at 9:9-10.  While the Water
Department "would like to do [so,]" it is delayed by complaints
and other matters, and "have a shortage of manpower." Id. at
10:3-9.

-7-

On the other hand, the Water Department sends its supervisors a letter if a particular inlet area has not been cleaned in twelve months or more.  Id. at 27:16-24, 28:1.  Mr. Brown indicated that the Water Department cleans the sewers as the only precaution to prevent overflowing.  Id. at 28:11-22.  To the best of his knowledge, the Water Department does not use flood gates to prevent sewage overflow.  Id. at 28:23-24, 29:1-18.  He said, "[i]f the river overflows, then the water is going to come back up through the inlet."  Id. at 29:19-21.

With respect to the intersection, Mr. Brown confirmed that the area is a "trouble spot" because it has a history of flooding.  Id. at 31:19-24, 32:1-11.  He described a trouble spot as "a place [the Water Department] knows personally that . . . completely may overflow due to the inlets being clogged or with the debris on top of it."  Id. at 31:24, 32:1-3.  According to Mr. Brown, trouble spots are checked in the event of major storms.  Id. at 32:3-4.

    2.   <u>Defendants' proofs</u>

        a.   Mark Rosencranz's and Craig Benedict's expert
<u>report</u>

AMTRAK's experts, Mark Rosencranz[6] and Craig Benedict,[7]
P.E. (the "AMTRAK Experts"), prepared a joint report regarding
the incident on August 1, 2004.  AMTRAK's Expert Report.  In
preparing the expert report, the AMTRAK Experts specifically
considered the following: (1) site visits; (2) review of
depositions and testimony by all parties; (3) review of Mr.
Tesoriero's expert report; (4) review of the documented
historical changes within the immediate location of study; (4) a
meteorological expert report by Dr. Lowell Krawitz ("Dr.
Krawitz's report" and "Dr. Krawitz," respectively); and (5)
hydrologic reports completed by the Philadelphia Water
Department.  <u>Id.</u> at 1.

The AMTRAK Experts determined that the storm was a 100-
year event.  <u>Id.</u> at 15.  "This type of storm was beyond the
capacity of the city combination storm sewers and definitely
beyond the capacity for the standard street inlet collection
capabilities."  <u>Id.</u>  New and historic maps show the existence of
a pair of sidings prior to development.  <u>Id.</u>  However,
redevelopment altered the original drainage path.  <u>Id.</u>  According

---

    [6]    Mark Rosencranz is with Gannett Fleming, Inc.

    [7]    Craig Benedict is a professional engineer with Gannett
Fleming, Inc.

to the expert report,

> [t]he redevelopment did not compensate for the removal
> of the existing drainage patterns as required by law.
> Their construction resulted in the storm water runoff
> continuing down the existing railroad towards Woodbine
> Avenue.  This doesn't result in much damage during
> small events since the water generally weeps off the
> side embankments to its original paths.  However,
> during large events, especially during a wave action
> resulting from the overtopping at the Mill Creek
> culvert, this runoff generally makes its way to the
> area at the existing steam plant wall located on the
> Glenn property.  Unfortunately this invites slope or
> trench failure along the shoulder.

Id.

The AMTRAK Experts also relied on Plaintiffs' testimony
about hearing certain noises just prior to seeing a wave
traveling uphill at a high rate of speed.  Id.  Under the AMTRAK
Experts' theory, Woodbine Avenue must have already been flooded.
Id.  Therefore, "the ballast movement was a result and not [a]
cause of flooding at Woodbine Avenue."  Id. at 16.


   b.   Dr. Lowell Krawitz's expert report

Dr. Krawitz[8] prepared a meteorological expert report
concerning the storm.  He found that the storm "occurred
primarily between the hours of 6:30 a.m. to 10:30 a.m. on August
1, with the heaviest rains occurring within a two-hour period . .
. ."  Krawitz Expert Report 2.  Dr. Krawitz consulted Saint

---

   [8]   Dr. Krawitz is a Ph.D with Lowell Krawitz Associates
conducting applied research in meteorology and climatology and
forensic meteorology.

Joseph's University rain gauge, which recorded 3 inches of rain between 7:15 a.m. and 8:15 a.m.  Dr. Krawitz then reviewed the Doppler radar image over the intersection.  In his opinion, "somewhere between 1.5 and 3 inches" of rain fell at the intersection over a two-hour period.  Id.  Thus, the rainfall was the equivalent of a thirty-five-year to fifty-year storm.  Id.

Over a four-hour period, certain indicators provide that between four and six inches of rain fell in the area.  Id. at 3.  Depending on the particular frequency curve, the rainfall was the equivalent of a one-hundred-year to two-hundred-year storm.  Id.  In conclusion:

> In the Overbrook section of Philadelphia, including the site of concern in this case, 62nd and Woodbine Avenue, the rainfall within the period 7:15 a.m. to 9:15 a.m. exceeded 3.5 inches and reached a peak intensity equivalent to a 35-year to 50-year storm.  Along City Line Avenue in Wynnefield and into Montgomery County, rainfall intensities exceeded that of a 100-year storm with 3 inches of rain falling in the hour 7:15 a.m. to 8:15 a.m.  In the Roxborough section of the city, almost 5.5 inches of rain with a peak intensity far exceeding that of a 100-year storm was measured.  Based on Doppler radar measurements, the National Weather Service determined that 4 to 5 inches of rain fell in Lower Merion Township of Montgomery County and 5 to 6 inches of rain deluged nearby sections of Delaware County including Upper Darby.  Based on the NOAA Atlas 14, the rainfall intensity in Lower Merion reached that of a 200-year storm with the rainfall in Delaware County being equated to a once in a millenium [sic] event.

Id.

-11-

c.   David H. Fleisher's expert report

The City's expert, David H. Fleisher, P.E. ("Mr.
Fleisher"),[9] prepared a report regarding the incident on August
1, 2004.  City's Expert Report 1.  Specifically, Mr. Fleisher was
charged with determining whether "clogged inlets or clogged
sewers caused this flood . . . ."  Id. at 2.  Mr. Fleisher
considered the following in preparing the expert report: (1)
Philadelphia Water Department Customer Information Display Forms;
(2) Water Department records; (3) drawings from the Water
Department; (4) Plaintiffs' depositions; (5) photographs; (6)
newspaper articles; (7) pleadings and other documents in this
case; (8) a meteorological expert report prepared by Dr. Krawitz;
and (9) several site visits.  Id. at 2.

Mr. Fleisher opined that "[t]he maintenance of the
inlets by the City . . . did not cause the resulting flood . . .
."  Id. at 3, 7.  He reasons that the cause was reverse water
flow.  Id. at 3, 5.  After review of the City's maintenance
records, Mr. Fleisher also determined that the sewer system was
not clogged prior to the flood.  Id. at 5.  The maintenance
records included twelve complaints, which are as follows:

---

[9]   Mr. Fleisher is a licensed professional engineer in the
New Jersey (1986) and Pennsylvania (1975).  He has a bachelor of
science degree in engineering from Widener University (1972) and
a master of science degree in civil engineering from Drexel
University (1975).  Mr. Fleisher is currently a consulting
engineer for Fleisher Forensics.

-12-

Inlet North Side of Woodbine Avenue 140 feet East of 62nd Street:

(1) A complaint was recorded on November 9, 1998, and no cleaning was required on January 5, 1999.
(2) A complaint was recorded on October 17, 2000, and the inlet was cleaned on October 20, 2000.
(3) A complaint was recorded on April 18, 2002, and the inlet was cleaned on April 19, 2002.
(4) A complaint was recorded on May 2, 2002, and the inlet was cleaned on May 2, 2002.
(5) A complaint was recorded on January 13, 2003, and the inlet was cleaned on January 14, 2003.
(6) A complaint was recorded on November 4, 2003, and the inlet was cleaned on November 5, 2003.
(7) A complaint was recorded on August 4, 2004, and the inlet was cleaned on August 4, 2004.

Inlet South Side of Woodbine Avenue 140 feet East of 62nd Street:

(8) A complaint was recorded on May 2, 2002, and the inlet was cleaned on May 2, 2002.
(9) A complaint was recorded on January 13, 2003, and the inlet was cleaned on January 14, 2003.
(10) A complaint was recorded on June 1, 2003, and the inlet was cleaned on June 1, 2003.
(11) A complaint was recorded on November 4, 2003, and the inlet was cleaned on November 5, 2003.
(12) A complaint was recorded on August 4, 2003, and the inlet was cleaned on August 4, 2004.

Id. at 5-6.  Based on the foregoing, Mr. Fleisher stated that "it was plausible that ballast from the railroad washed down toward the inlets . . . [but it] did not effect and cause the flood." Id. at 6.

-13-

B. <u>Procedural History</u>

On September 15, 2008, each Defendant filed a motion for summary judgment.  (Doc. nos. 76, 77, 79.)  Plaintiffs have filed oppositions thereto.  It is these three motions for summary judgment that are before the Court.

II.  ANALYSIS

A.  <u>Rule 56(c) Standard</u>

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is "material" if its existence or non-existence would affect the outcome of the suit under governing law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  An issue of fact is "genuine" when there is sufficient evidence from which a reasonable jury could find in favor of the non-moving party regarding the existence of that fact.  <u>Id.</u> at 248-49.  "In considering the evidence, the court should draw all reasonable inferences against the moving party." <u>El v. Se. Pa. Transp. Auth.</u>, 479 F.3d 232, 238 (3d Cir. 2007).

"Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by showing-that

-14-

is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof." Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004) (quoting Singletary v. Pa. Dep't of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001)).  Once the moving party has thus discharged its burden, the nonmoving party "may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in [Rule 56]--set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).

B.   The City's Motion for Summary Judgment

The City argues that there is no evidence of negligent maintenance or construction of the sewage drains in the vicinity of the intersection, as required by the Pennsylvania Political Subdivision Tort Claims Act, 42 Pa. C.S. §§ 8541-64 (the "PSTCA").  Under the PSTCA, local agencies are afforded immunity from suits for damages caused to persons or property with few exceptions.  42 Pa. C.S. § 8541-42.[10]

A plaintiff must, however, first meet three threshold

_____

[10]   A "local agency" is defined as "[a] government unit other than the [Pennsylvania] government.  The term includes an intermediate unit."  42 Pa. C.S. 8501.  Accordingly, the City is a local agency within the meaning of the PSTCA.

-15-

requirements: (1) the damages would be recoverable under common law or statute; (2) the injury was caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties; and (3) the act by a local agency or any of its employees falls within one of eight enumerated categories.  42 Pa. C.S. § 8542(a)-(b).  The eight enumerated categories include: (1) vehicle liability; (2) care, custody, or control of personal property; (3) real property; (4) trees, traffic controls, and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; and (8) care, custody, or control of animals.  42 Pa. C.S. § 8542(b)(1)-(8).

It is uncontested that the utility service facilities exception applies in this case.  The City can be held liable under this exception for:

> [a] dangerous condition of the facilities of . . .
> sewer . . . systems owned by the [City] and located
> within rights-of-way, except that the claimant to
> recover must establish that the dangerous condition
> created a reasonably foreseeable risk of the kind of
> injury which was incurred and that the local agency had
> actual notice or could reasonably be charged with
> notice under the circumstances of the dangerous
> condition at a sufficient time prior to the event to
> have taken measures to protect against the dangerous
> condition.

42 Pa. C.S. § 8542(b)(5).  The exceptions to immunity under the PSTCA are to be strictly construed and interpreted.  Lory v. City of Phila., 674 A.2d 673, 675-76 (Pa. 1996) (citing Kiley v. City of Phila., 645 A.2d 184, 185-86 (1994); Mascaro v. Youth Study

-16-

Ctr., 523 A.2d 1118, 1123 (Pa. 1987)).  As is the case here, a

storm water management system comprised of culverts, basins,

swales and/or drains has been repeatedly held by the Pennsylvania

Commonwealth Court to be the equivalent of a "sewer" for purposes

of the immunity statute.  See, e.g., Staffaroni v. City of

Scranton, 620 A.2d 676 (Pa. Commw. Ct. 1993); DeTurk v. South

Lebanon Twp., 542 A.2d 213 (Pa. Commw. Ct. 1988); Medicus v.

Upper Merion Twp., 475 A.2d 918 (Pa. Commw. Ct. 1984).[11]

        A municipal entity may not be held liable for an

inadequate storm water management system.  City of Wash. v.

---

[11]    Plaintiffs contend that this case also falls within the
real property exception under the PSTCA.  See 42 Pa. C.S. §
8542(b)(2).  The City can be held liable under this exception
for:

        [t]he care, custody or control of real property in the
        possession of the local agency, except that the local
        agency shall not be liable for damages on account of
        any injury sustained by a person intentionally
        trespassing on real property in the possession of the
        local agency.  As used in this paragraph, "real
        property" shall not include: (i) trees, traffic signs,
        lights and other traffic controls, street lights and
        street lighting systems; (ii) facilities of steam,
        sewer, water, gas and electric systems owned by the
        local agency and located within rights-of-way; (iii)
        streets; or (iv) sidewalks.

Id.  The Court holds that the real property exception is
inapplicable in this case.  The instant dispute arises from an
alleged negligently maintained or constructed sewer system.
Under the real property exception, sewer facilities are expressly
exempted out of the definition of "real property."  42 Pa. C.S. §
8542(b)(2)(ii).  Therefore, the Court's ruling that the storm
water management system in this case is a "sewer" precludes the
joint application of the real property exception.

Johns, 474 A.2d 1199, 1201-02 (Pa. Commw. Ct. 1984) (citing Yulis v. Borough of Edensburg, 128 A.2d 118, 120 (Pa. Commw. Ct. 1956)).  Liability does attach, however, if the plaintiff can prove the damages resulted from negligence in the construction or maintenance of the sewer system.  McCarthy v. City of Bethlehem, 962 A.2d 1276 (Pa. Commw. Ct. 2008); LaForm v. Bethlehem Twp., 499 A.2d 1373, 1382 (Pa. Super. Ct. 1985); Johns, 474 A.2d at 1202 (citing Yulis, 128 A.2d at 120).

In Johns, tenants and property owners sued the City of Washington seeking to recover damages caused by overflow of the storm drainage system under the sewer system exception to governmental immunity set forth in former Section 202(b)(5) of the Act of November 26, 1978, P.L. 1399, as amended, 53 P.S. § 5311.202(b)(5).[12]  Johns, 474 A.2d at 1201.  The evidence in Johns showed that there were large quantities of dirt and mud in the sewer system, which caused storm water to back up into the plaintiffs' basements about ten or twelve times over the course of thirteen years.  Id.  The plaintiffs requested that the city fix the problem on many occasions yet the city responded only once, which resulted in the removal of a significant amount of dirt and mud from the sewer system.  Id.

---

[12]    Section 202(b)(5) was repealed by Section 333 of the Act of October 5, 1980, P.L. 693.  The comparable provision is now referred to as the "utility service facilities" exception set forth in 42 Pa. C.S. § 8542(b)(5).

-18-

The Johns court affirmed the trial court's liability determination, finding that there was sufficient evidence that the city had notice of the problem and the damages were reasonably foreseeable.  Id. at 1203.  Specifically, the court pointed to four pieces of evidence by way of witness testimony: (1) the sewer system caused street and property flooding in the past; (2) the city was notified of the recurring problem on several occasions; (3) it responded only once; and (4) when it did respond a significant amount of dirt and mud was removed from the sewer system.  Id.

In McCarthy, a homeowner sued the City of Bethlehem seeking to recover damages caused by a flood in the lower level of the home.  962 A.2d at 1277.  The homeowner alleged the damages were caused by the city's failure to properly repair, maintain, and upgrade the sewer system under the utility service facilities exception to governmental immunity set forth in 42 Pa. C.S. § 8542(b)(5).  Id.

The McCarthy court overturned the trial court's grant of summary judgment in favor of the city because the evidence of record was sufficient to raise a genuine issue of material fact as to whether the elements of a cause of action under the utility service facilities exception were met.  Id. at 1280-81.  In particular, the court found the following evidence raised questions of fact for the jury to decide: (1) surface water

flooding many times from 1986 to 1999 and sewage infiltration many times from 1999 to 2006; (2) complaints lodged with the city beginning in 1999 stemming from "a sewage backup that occurred after the city capped off an illegal hookup between the storm water system and the sewage system in the neighborhood"; (3) a complaint prompted a response by the city whereby a monitor and a system to pump out water were placed in the wrong manhole; (4) after the monitor and the system to pump out water were placed in the manhole in front of the plaintiff's home the flooding stopped; and (5) "[w]hether the . . . rainstorm was such an extraordinary event as to constitute a superseding cause . . . ." Id. at 1280.

This Court has also already considered a remarkably similar action brought by some of the same Plaintiffs against the most of the same Defendants in this case. Woodbine Auto, Inc. v. SEPTA, 8 F. Supp. 2d 475 (E.D. Pa. 1998). The Woodbine Auto case involved a flood, which damaged the plaintiffs' real and personal property. Id. at 477. The plaintiffs alleged three theories in support of their claims. First, the railroad defendants, "in the course of their ownership, possession and control of real estate and railroad right of way, the[] defendants artificially diverted rainwater and increased the quantity of rainwater such that it would flood neighboring streets and property." Id. Second, the railroad defendants "were negligent and careless in that they

purportedly failed to inspect and maintain the area where the
flooding occurred, failed to warn them and failed to prevent or
diminish the flooding." Id.  Third, the City's "sewer system was
in a dangerous condition in that it would back up and cause
flooding in the area of [the intersection].  This dangerous
condition . . . was caused by the City's alleged failure to
properly inspect, repair and maintain the sewer system." Id.
Just as in the instant case, the claim against the City involved
the utility service facilities exception under 42 Pa. C.S. §
8542(b)(5).

        The City in the Woodbine Auto case moved for summary
judgment, which was denied because, "[w]hile inconclusive, th[e]
evidence [was] sufficient to allow the question of whether the
[C]ity's sewer/stormwater [sic] management system was in a
defective condition at the time of the July 14, 1994 storm to be
determined by the jury." Id. at 480.  The "scant" evidence in
the Woodbine Auto case was as follows: (1) testimony of floods in
the area of the intersection dating back thirty years, but not
since the July 14, 1994 flood because City began cleaning the
area every two weeks; (2) testimony and a letter from the
Philadelphia City Planning Commission to the Water and Sewer
Systems Planning Unit about a meeting with residents in the area
of the intersection regarding "a serious stormwater [sic] back-up
problem"; (3) testimony from an AMTRAK track supervisor that the

intersection was covered with six to eight inches of mud, stone, or ballast after the storm at approximately 8:30 p.m. on July 14, 1994; and (4) an expert report conveying that debris and solids clogged the inlets, which caused the flood.  Id.

Here, Plaintiffs have provided sufficient evidence against the City to survive a motion for summary judgment. First, Mr. Tesoriero characterized the storm as a two- to five-year rainfall event.  This was based on the fact that four inches of rain fell at the intersection area over a twenty-four-hour period.  In addition, he cited two previous rainfall events within a ten-year period where 5.58 (September 16, 1999) and 5.10 (July 12, 2004) inches of rain fell at the intersection area. Notably, the July 12, 2004 rainfall event, which occurred twenty days prior to the storm at issue in this case, produced 1.10 inches more rain than on August 1, 2004.

Based on this evidence, Mr. Tesoriero opined that the sewer system was clogged with stone ballast and railroad track base soils.  This then caused the flooding, which ultimately resulted in Plaintiffs' damages.  At the very least, the City had notice of a flooding condition at the intersection as evidenced by the twelve complaints between November 9, 1998 and November 4, 2003.  Furthermore, the flood that occurred at the intersection on July 10, 1994 resulted in damages to the same area in question following a 3.75 inch rainfall event.  This event was the basis

of a lawsuit by Rooney, Woodbine, and others against the SEPTA, Consolidated Rail Corp., AMTRAK, and the City.

Second, Mr. Brown testified that the Water Department does not have a procedure or policy in place governing the frequency to which the sewers are cleaned.  Although the Water Department aspires to clean the sewers once or twice a year, they are hampered by complaints, other matters, and a shortage of manpower.  This is particularly relevant because Mr. Brown indicated that the only precaution to prevent overflowing is cleaning and the Water Department does not use flood gates. Given the designation of the intersection as a "trouble spot" because of its history of flooding, the reasonableness of the City's action or inaction is a question better left to a jury.

In contrast, Defendants introduce evidence, in the form of expert reports, concluding that the storm was an uncontrollable and overriding event and the cause of the flood was not the result of improper maintenance of the sewer system. First, the AMTRAK experts determined that the storm was a one-hundred-year event, which was beyond the sewer system's capacity. Under their theory, the intersection was flooded prior to any ballast movement.  In other words, the sewer system was not clogged with ballast.  Rather, the flood caused the ballast movement.

Second, Dr. Krawitz utilized two parameters by which to

classify the storm.   Over a two-hour period, he concluded that the storm was the equivalent of a thirty-five-year to fifty-year storm.   Over a four-hour period, Dr. Krawitz concluded the storm was the equivalent of a one-hundred-year to two-hundred-year storm.

Third, Mr. Fleisher attributes the flood to reverse water flow.   He specifically denounces Plaintiffs' theory that negligent maintenance caused the flood.   Mr. Fleisher further determined that the sewer system was not clogged prior to the flood.   This opinion is based on the City's response to complaints between November 8, 1998 and November 4, 2003.   It is the City's position that it responded quickly and completed any and all maintenance required, cleared clogged inlets, and inspected the area for any further clogs   Based on the complaint record listed in Mr. Fleisher's report, the City responded promptly to a majority of the complaints.   However, the complaint recorded on August 4, 2003 regarding the south side of the intersection went unattended for a year.

In summary, Plaintiffs' and Defendants' expert opinions are in direct conflict with each other.   To the extent the differing opinions must be reconciled, such a factual interpretation is within the province of a jury.   It is not for the Court to determine a winner in this battle of the experts. For the foregoing reasons, Plaintiffs have raised genuine issues

of material fact as to whether the City negligently maintained or constructed the sewer system.  Therefore, the City's motion for summary judgment will be denied.


    C.    <u>SEPTA's Motion for Summary Judgment</u>

    SEPTA seeks summary judgment on the grounds that Plaintiffs' claims are barred by sovereign immunity.  Even if Plaintiffs' claims are not barred, SEPTA argues it did not owe Plaintiffs a duty of care.  Lastly, SEPTA contends that Mr. Tesoriero's expert report should be disregarded under <u>Daubert</u>.


    1.    Whether sovereign immunity bars Plaintiffs' claim for negligent maintenance or construction of the Bridge and the adjacent tracks or negligent maintenance or construction of the sewer system

    Commonwealth parties are protected from suit by sovereign immunity unless it is expressly waived.  1 Pa. C.S. § 2310.  SEPTA is recognized as a Commonwealth party for the purposes of the sovereign immunity statute.  <u>See</u> <u>S.E. Pa. Transp. Auth. v. Hussey</u>, 588 A.2d 110, 111 (Pa. Commw. Ct. 1991) (citing <u>Chambers v. S.E. Pa. Transp. Auth.</u>, 563 A.2d 603, 604-05 (Pa. Commw. Ct. 1989)); <u>Chambers</u>, 563 A.2d at 604-05 (citing <u>Feingold v. S.E. Pa. Transp. Auth.</u>, 517 A.2d 1270, 1276 (Pa. 1986)); <u>see also</u> <u>Taylor v. S.E. Pa. Transp. Auth.</u>, Civil Action No. 06-3426, 2007 WL 4887, *3 (E.D. Pa. 2007); <u>S.E. Pa. Transp. Auth. v. Bd. of Revision of Taxes</u>, 777 A.2d 1234, 1237 (Pa. Commw. Ct. 2001).

Sovereign immunity has been waived for "damages arising out of a negligent act where the damages would be recoverable under the common law or a statute creating a cause of action . . . ." 42 Pa. C.S. § 8522(a).  In particular, the following acts by Commonwealth parties may result in liability: (1) operation of a motor vehicle; (2) acts of health care employees; (3) care, custody, or control of personal property; (4) a dangerous condition of Commonwealth real estate, highways, and sidewalks; (5) a dangerous condition of highways created by potholes, sinkholes, or other similar conditions created by natural elements; (6) care, custody, or control of animals; (7) sale of liquor at Pennsylvania liquor stores; (8) acts of members of the Pennsylvania military forces; and (9) use of toxoid or vaccines. 42 Pa. C.S. § 8522(b)(1)-(9).

The real estate exception under 42 Pa. C.S. § 8522(b)(4) is invoked in this case.  SEPTA can be held liable under this exception for:

> [a] dangerous condition of Commonwealth agency real estate and sidewalks, including Commonwealth-owned real property, leaseholds in the possession of a Commonwealth agency and Commonwealth-owned real property leased by a Commonwealth agency to private persons, and highways under the jurisdiction of a Commonwealth agency . . . .

42 Pa. C.S. § 8522(b)(4).  These exceptions to immunity are strictly construed.  Fagan v. Dept. of Transp. of the Commw., 946 A.2d 1123, 1126 (Pa. Commw. Ct. 2008) (citing Dean v. Commw.,

-26-

Dept. Of Transp., 751 A.2d 1130, 1132 (Pa. 2000)); see also
Mullin v. Commw., Dept. Of Transp., 870 A.2d 773, 779 (Pa. 2005).

The Pennsylvania Supreme Court in Snyder v. Harmon,
stated "[t]he unambiguous language of Section 8522(b)(4) . . .
indicate[s] that a dangerous condition must derive, originate
from or have as its source the Commonwealth realty."  562 A.2d
307, 311 (Pa. 1989); see, e.g., Donnelly v. S.E. Pa. Transp.
Auth., 708 A.2d 145, 149 (Pa. Commw. Ct. 1998) (requiring injury
be "caused by a condition of government realty itself . . .")
(emphasis in original).  Snyder involved an action whereby
motorists fell off a Pennsylvania highway into a strip mine.  Id.
at 308-09.  The plaintiffs' theory was that Pennsylvania
Department of Transportation ("PennDOT") failed to warn motorists
of the strip mine by adding lighting or installing guardrails.
Id. at 309.  The Pennsylvania Supreme Court in Snyder reinstated
the order of the trial court granting PennDOT immunity from suit
because the dangerous condition did not involve Commonwealth
property.  Id. at 312-13.

The decision in CSX Transp., Inc. v. Franty Const., is
also instructive with respect to whether the real estate
exception set forth in 42 Pa. C.S. § 8522(b)(4) applies.  630
A.2d 932, 934-35 (Pa. Commw. Ct. 1993).  The court in CSX
reasoned that the real estate exception requires that "the
Commonwealth agency have title, ownership, physical possession or

-27-

actual control over the real property in question."  Id. at 935
(citing Snyder, 519 A.2d 528).

In CSX, the plaintiff brought suit against the
Department of Environmental Resources ("DER") for damages that
resulted from a landslide emanating from a DER-regulated strip
mine.  Id. at 933.  The plaintiff's theory was DER possessed and
controlled the strip mine because it issued mining permits for
the site, sought legal action against the company mining the
site, and contracted with other companies regarding reclaiming
the site.  Id. at 934-35.

In that case, the court found that it was undisputed
that the defendant "did not have title, ownership or physical
possession of the [property]."  Id. at 935.  The court then
disagreed with the plaintiff's argument that the defendant's
"involvement with the strip mining and reclamation of the mine
amounted to constructive possession or actual control, thus
rendering [the defendant] potentially liable under the real
estate exception to sovereign immunity."  Id.  In concluding that
the plaintiff's claim did not fall within the real estate
exception to sovereign immunity, the court stated that
"[l]icensing, inspection and regulation of a strip mine are not
equivalent to actual control over the operation of a strip mine
or the reclamation of a strip mine."  Id. at 935.

Here, SEPTA avers that there is no evidence that it

-28-

owns or controls the Bridge or the adjacent track.  AMTRAK actually acknowledges ownership.  In response, Plaintiffs concede that SEPTA does not own the Bridge or the adjacent track. Plaintiffs maintain, however, that SEPTA has control over same because it managed the design and construction of the Overbrook maintenance facility, which included SEPTA paying AMTRAK to create a turnout on Track 4 on the west end before the Bridge. The turnout on Track 4 is also used by SEPTA to enter the facility.

This argument, while superficially slightly different than the question of ownership, is substantively the same. Plaintiffs bear the burden of persuasion and must present evidence, by affidavits or otherwise, that SEPTA controlled the Bridge or the adjacent track.  See Estate of Zimmerman v. S.E. Pa. Transp. Auth., 168 F.3d 680, 685 (3d Cir. 1999).  They have failed to meet their burden.

Mr. Tesoriero's expert report asserts that SEPTA's negligent construction of the turnout on Track 4 and its failure to maintain the Bridge and the adjacent track were significant contributing causes of Plaintiffs' damages.  With respect to control, Plaintiffs rely exclusively on Mr. Di Camillo's deposition testimony.  Mr. Di Camillo testified that AMTRAK constructed two turnouts from the existing tracks to the Overbrook maintenance facility as part of a transaction whereby

-29-

SEPTA purchased the facility from AMTRAK.  According to Mr. Di Camillo, SEPTA is permitted access to the Bridge and the adjacent track, but AMTRAK owns and maintains them.  Plaintiffs' reliance on Mr. Di Camillo's deposition testimony is misguided because his statements suggest that SEPTA has no control over the property. According to Mr. Di Camillo, SEPTA paid AMTRAK to construct the turnouts to accommodate access to the Overbrook maintenance facility.  Despite Plaintiffs' contention that SEPTA designed the turnouts, the turnouts were on AMTRAK's property and AMTRAK was responsible for the construction.

Pennsylvania law clearly requires that the alleged damage originate from property owned or actually controlled by SEPTA.  The instant case is similar to CSX because SEPTA was not involved with the day-to-day operations at the property at issue. Like CSX, SEPTA neither owns the Bridge and the adjacent track, nor has such hands-on involvement to amount to constructive possession or actual control.

Plaintiffs also seek to hold SEPTA liable for negligent maintenance or construction of the sewer system at the intersection.  Pursuant the reasoning set forth in Bonsavage v. Borough of Warrior Run, a Commonwealth party could be held liable for negligent failure to maintain a sewer system under the real estate exception to sovereign immunity under 42 Pa. C.S. § 8522(b)(4).  676 A.2d 1330, 1332 (Pa. Commw. Ct. 1996)

(permitting the plaintiffs' failure to maintain sewer pipes claim to proceed against PennDOT under real estate exception provided for in 42 Pa. C.S. § 8522(b)(4)).[13]  As discussed above, the real estate at issue must be owned by the Commonwealth party.  Since the City acknowledges ownership and responsibility for the maintenance of the sewer system but not SEPTA, <u>Bonsavage</u> is not applicable here.  Therefore, Plaintiffs' claims against SEPTA are barred by sovereign immunity.[14]

---

[13]   The Court recognizes, however, that this ruling may require clarification as it relates to sewer systems.  Unlike the utility service facilities exception in the PSTCA, the General Assembly did not expressly waive sovereign immunity for Commonwealth parties in actions relating to sewer systems under 42 Pa. C.S. § 8522.  By way of example, the real property exception to sovereign immunity as it applies to local agencies under 42 Pa. C.S. § 8542(b)(3)(ii) explicitly excludes sewer facilities from the definition of "real property."  Section 8542(b)(5) then expressly establishes the utility service facilities exception to sovereign immunity, which includes sewer systems.

In contrast, the real estate exception to sovereign immunity as it applies to Commonwealth parties under 42 Pa. C.S. § 8522(b)(4) is silent with respect to whether it applies to sewer facilities.  As previously stated, there is no comparable exception under 42 Pa. C.S. § 8522(b) similar to the utility service facilities exception under 42 Pa. C.S. § 8542(b).  Perhaps the General Assembly's silence in 42 Pa. C.S. § 8522(b) was a decision not to waive sovereign immunity for claims arising out of sewer systems against Commonwealth parties.

[14]   The Court need not address whether there is sufficient evidence that SEPTA diverted the storm water runoff from its natural flow because Plaintiffs' claims against SEPTA are barred by sovereign immunity.  Moreover, SEPTA's position that Plaintiffs' claims are preempted by the Federal Railway Safety Act will be considered in conjunction with AMTRAK's motion for summary judgment.

2.   <u>Whether SEPTA owed a duty to Plaintiffs</u>

Even if Plaintiffs' claims against SEPTA were not barred by sovereign immunity, there is no evidence that SEPTA owned or was responsible for the construction or maintenance of the sewer system.  Since Plaintiffs bear the burden of persuasion, they are obligated to raise a genuine issue of material fact in their response, by affidavits or otherwise, that SEPTA owned, constructed, or was responsible for the maintenance of the sewer system.  See <u>Estate of Zimmerman</u>, 168 F.3d at 685.

The <u>prima facie</u> elements for a negligence claim are: (1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the defendant's breach of the duty and the resulting injury; and (4) actual loss or damage suffered by the plaintiff.  <u>Cooper v. Frankford Health Care Sys., Inc.</u>, 960 A.2d 134, 139 n.2 (Pa. Super. Ct. 2008).  Failure to establish one of the elements for a negligence claim is valid grounds to grant summary judgment.  <u>McMahon v. Pleasant Valley West Ass'n</u>, 952 A.2d 731, 735 (Pa. Commw. Ct. 2008).

"[T]he existence of a duty is a question of law for the court to decide[.]" <u>Cooper</u>, 960 A.2d at 143 (quoting <u>Commerce Bank/Pa. v. First Union Nat'l Bank</u>, 911 A.2d 133, 137 (Pa. Super. Ct. 2006).  A defendant must own or control the property that caused the plaintiff's injury before a duty is imposed.  <u>See, e.g.</u>, <u>Snyder</u>, 562 A.2d at 312-13 (granting immunity when

dangerous condition did not involve the defendant's property);
Donnelly, 708 A.2d at 149 (requiring injury be "caused by the
*government realty itself* . . . ."); CSX, 630 A.2d at 935
(requiring "title, ownership, physical possession or actual
control over the real property in question.").

Here, the City acknowledges ownership and
responsibility for the maintenance of the sewer system at issue.
Specifically, Plaintiffs state that "some of the evidence
obtained as a result of discovery revealed that [the City] owns,
constructed, maintain and/or controlled the storm sewer drain [at
the intersection]."  Pls.' Resp. to SEPTA's Mot. Summ. J. 10
(doc. no. 88).  Plaintiffs then discuss evidence relating to
SEPTA's interest in the Bridge and the adjacent track.
Plaintiffs' attempt to obfuscate the issue is not helpful and its
brief on this point is non-responsive.  Accordingly, there is no
genuine issue of material fact over ownership and responsibility
for the maintenance of the sewer system.  The Court finds that
SEPTA did not owe Plaintiffs a duty.  Therefore, even if
Plaintiffs' claims were not barred by sovereign immunity, SEPTA
is entitled to summary judgment under a common law negligence
theory.

> 3.   Whether Mr. Tesoriero's expert report should be
>      <u>excluded</u>

SEPTA argues that Mr. Tesoriero's expert report fails

to satisfy the Daubert standard because his opinions are
unsupported by admissible evidence, and legally and factually
deficient.  In particular, SEPTA avers as follows:

> [Mr. Tesoriero's] report . . . is based upon a visit to
> the flood site almost four years after it occurred, and
> a review of [P]laintiffs' complaint, an anonymous
> weather analysis report prepared by a company called
> CompuWeather, news footage of flooding at various
> locations within the Delaware Valley, several hundred
> photos documenting flood damage and clean up, and
> website maps and aerial photographs of the area. [Mr.
> Tesoriero] admits that he has not reviewed any of the
> [D]efendants [sic] records concerning investigations,
> engineering, and maintenance efforts that may have been
> performed during the 10 years that preceded the 2004
> flood.

SEPTA Mot. Summ. J. 21-22 (doc. no. 77).

Under Daubert v. Merrell Dow Pharmaceuticals, Inc., a
"trial judge must ensure that any and all scientific testimony or
evidence admitted is not only relevant, but reliable."  509 U.S.
579, 589 (1993).  Expert testimony is admissible only where "the
expert is proposing to testify to (1) scientific knowledge that
(2) will assist the trier of fact to understand or determine a
fact in issue."  Id. at 592.

In order to constitute "scientific knowledge," the
expert's proposed opinion "must be derived by scientific method .
. . and supported by appropriate validation, i.e., 'good
grounds.'"  Id. at 590.  Expert testimony is deemed to assist the
trier of fact to understand or determine a fact in issue where
"the expert testimony proffered in the case is sufficiently tied

-34-

to the facts of the case that it will aid the jury in resolving a
factual dispute." Id. at 591. "The consideration has been aptly
described . . . as one of 'fit.'" Id. In other words, Daubert
requires a "valid scientific connection to the pertinent inquiry
as a precondition to admissibility" of expert testimony. Id. at
592. "This requires a preliminary assessment of whether the
reasoning or methodology underlying the [proposed] testimony is
scientifically valid and of whether that reasoning or methodology
properly can be applied to the facts in issue." Id. at 593.

Factors that may guide a district court's preliminary
assessment of these requirements include (1) whether the
methodology can and has been tested; (2) whether the technique
has been subjected to peer review and publication; (3) the known
or potential rate of error of the methodology; and (4) whether
the technique has been generally accepted in the proper
scientific community. Heller v. Shaw Industries, Inc., 167 F.3d
146, 152 (3d Cir. 1999) (citing Daubert, 509 U.S. at 593-94).
The district court's role as the gatekeeper is a "flexible one"
and "the factors are simply useful signposts, not dispositive
hurdles that a party must overcome in order to have expert
testimony admitted." Heller, 167 F.3d at 152.

In addition to the factors listed above, the Third
Circuit suggested that the district court consider additional
factors, including (1) the existence and maintenance of standards

-35-

controlling the technique's operation; (2) the relationship of
the technique to methods which have been established to be
reliable; (3) the expert witness's qualifications; and (4) the
non-judicial uses to which the method has been put.  Heller, 167
F.3d at 152 (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d
717, 742 n.8 (3d Cir. 1994)); see Johnson v. Vane Line Bunkering,
Inc., No. 01-5819, 2003 WL 23162433, at *2-3 (E.D. Pa. Dec. 30,
2003) (Robreno, J.).

Here, Mr. Tesoriero has a bachelor of science in civil
engineering from Drexel University, and is licensed as a
professional engineer, a professional planner, a wastewater
collection system operator, and a RCS building inspector.  His
methodology is eminently testable.  In fact, the expert reports
provided by Mr. Tesoriero and the AMTRAK experts both took into
account the review of legal documentation relating to the case,[15]
site inspections, and third party reports.  Ultimately, Mr.
Tesoriero concluded that Defendants were liable for the damages
caused by the storm, while the AMTRAK experts concluded
otherwise.

Furthermore, there is nothing to suggest that the
techniques used by Mr. Tesoriero in the expert report are
atypical of those used by civil engineers in preparing forensic

---

[15]    Mr. Tesoriero reviewed Plaintiffs' amended complaint.
The AMTRAK experts reviewed depositions and testimony by all
parties.

reports.  Although SEPTA challenges Mr. Tesoriero's expert report on the merits, that is not a "gate keeping" function which the Court is assigned under Daubert.

Under these circumstances, the Court finds that Mr. Tesoriero is qualified to render an opinion on cause of the damages resulting from the August 1, 2004 incident, that the opinion is based on scientific knowledge, and will assist the jury in resolving the factual dispute in this case.  Therefore, for the purposes of the instant motion for summary judgment, the Court will not disregard Mr. Tesoriero's expert report.[16]

D.   Whether Plaintiffs' Strict Liability and Injunctive
     Relief Claims Against the City and SEPTA Are Barred by
     Sovereign Immunity

The exceptions to governmental immunity are limited to claims of negligence.  42 Pa. C.S. § 8542(a)(2); Cory v. Stroudsburg Area Sch. Auth., 13 Pa. D. & C.4th 27, 31-32 (Pa. Com. Pl. 1991) (dismissing strict liability claim against a local agency because "exceptions to governmental immunity . . . only apply to negligent acts by a local agency."); cf. Crockett v. Edinboro Univ., 811 A.2d 1094, 1095-96 (Pa. Commw. Ct. 2002) (stating in dicta that claims alleging unfair acts and deceptive practices were barred by sovereign immunity against a Commonwealth party); Clark v. S.E. Pa. Transp. Auth., 691 A.2d

---

[16]   The parties may, however, file a motion requesting a Daubert hearing prior to the commencement of trial.

988, 991-92 (Pa. Commw. Ct. 1997) (holding assault, battery, and excessive force claims were barred by sovereign immunity against a Commonwealth party).  Furthermore, in <u>Swift v. Dept. of Transp. of the Commw. of Pa.</u>, the court recognized "[t]he General Assembly has not waived immunity for equitable claims seeking affirmative action by way of injunctive relief."  937 A.2d 1162, 1168 (Pa. Commw. Ct. 2007) (citing <u>Bonsavage</u>, 676 A.2d at 1331-32).

Here, Plaintiffs assert claims of strict liability and seek injunctive relief against Defendants.  Since the City and SEPTA are protected by sovereign immunity, Plaintiffs' claims must fall within the exceptions set forth in 42 Pa. C.S. § 8542. In accordance with the mandate to strictly construe and interpret these exceptions, Pennsylvania courts have precluded claimants seeking to hold parties protected by sovereign immunity under theories other than negligence.  <u>See, e.g.</u>, <u>Cory</u>, 13 Pa. D. & C. 4th at 31-32; <u>Crockett</u>, 811 A.2d at 1095-96; <u>Clark</u>, 691 A.2d at 991-92; <u>Swift</u>, 937 A.2d at 1168.  Therefore, the City and SEPTA are immune from suit under a strict liability or injunctive relief theory.[17]

----

[17]     Defendants have not objected to Plaintiffs' nuisance claim.  Nevertheless, the reasoning set forth in <u>Cory</u> suggests an action sounding in nuisance may proceed against a party protected by sovereign immunity because negligence can serve as an element of proving nuisance.  13 Pa. D. & C.4th at 31 (justifying dismissal of strict liability claim on <u>Carrecter v. Colson Equip. Co.</u>, 499 A.2d 326, 330 (Pa. Super. Ct. 1985), which established

E.    <u>AMTRAK's Motion for Summary Judgment</u>

    1.    Federal preemption

        a.    Subject matter jurisdiction

AMTRAK argues that Plaintiffs' claims are preempted by the Federal Railroad Safety Act, 49 U.S.C. § 20101, et seq. ("FRSA").  Challenges on preemption grounds are jurisdictional. <u>In re Lord Abbett Mutual Funds Fee Litig.</u>, 553 F.3d 248, 254 (3d Cir. 2009).  Matters pertaining to subject matter jurisdiction may be addressed by a district court at any stage in the proceedings.  <u>See</u> <u>CNA v. United States</u>, 535 F.3d 132, 146 (3d Cir. 2008).  Therefore, whether Plaintiffs' claims are preempted by FRSA is properly before this Court.


        b.    Whether Plaintiffs' claims are preempted by
               <u>the Federal Railroad Safety Act</u>

Federal preemption is premised upon the Supremacy Clause of the United States Constitution, which states that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States,

---

that negligence is not an element of proof for a strict liability claim).  In Pennsylvania, the elements of a private nuisance are: (1) the defendant's conduct legally caused the invasion; and (2) the defendant's conduct was intentional and unreasonable or reckless, <u>negligent</u>, or abnormally dangerous.  <u>Diess v. Pa. Dept. of Transp.</u>, 935 A.2d 895, 906 (Pa. Commw. Ct. 2007) (citing Restatement (Second) of Torts § 822) (emphasis added).

shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding. U.S. Const. art. VI, cl. 2.  The Supreme Court has interpreted the Supremacy Clause as invalidating all state laws that "interfere with, or are contrary to," federal law. Hillsborough County v. Automated Med. Labs., 471 U.S. 707, 712 (1985) (quoting Gibbons v. Ogden, 22 U.S. 1, 82 (1824)).  As a result, federal preemption analysis always starts with a question of congressional intent, and then proceeds to a discussion of the state law's interaction with the federal law or regulation.  See Wyeth v. Levine, 129 S. Ct. 1187, 1195 (2009); English v. Gen. Elec. Co., 496 U.S. 72, 78-79 (1990); see also Medtronic v. Lohr, 518 U.S. 470, 485 (1996) ("'[t]he purpose of Congress is the ultimate touchstone' in every preemption case")(citation omitted).

State action may be preempted by federal law in three ways.  Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 541 (2001); Bruesewitz v. Wyeth Inc., – F.3d –, No. 07-3794, 2009 WL 792468, *4-*6 (3d Cir. Mar. 27, 2009) Lindsey v. Catepillar, Inc., 480 F.3d 202, 205 (3d Cir. 2007).  First, where Congress expressly preempts state law.  Id.  Second, where Congress indicates by implication that federal law shall exclusively occupy a field of regulation.  Id.  Third, where state law conflicts with federal law.  Id.

A district court is directed to begin its inquiry by
determining the "purpose of Congress" by considering the federal
law in question.  See, e.g., Wyeth,129 S. Ct. at 1195;
Bruesewitz, – F.3d –, 2009 WL 792468, *9.  Under FRSA, the
purpose "is to promote safety in every area of railroad
operations and reduce railroad-related accidents and incidents.
49 U.S.C. § 20101.  The Secretary of Transportation is authorized
thereunder to "prescribe regulations . . . for every area of
railroad safety . . . ."  49 U.S.C. § 20103(a).  Moreover,
Congress provided an express preemption provision set forth in 49
U.S.C. § 20106, which is as follows:

> [l]aws, regulations, and orders related to railroad
> safety and laws, regulations, and orders related to
> railroad security shall be nationally uniform to the
> extent practicable.  A State may adopt or continue in
> force a law, regulation, or order related to railroad
> safety or security until the Secretary of
> Transportation (with respect to railroad safety
> matters), or the Secretary of Homeland Security (with
> respect to railroad security matters), prescribes a
> regulation or issues an order covering the subject
> matter of the State requirement.  A State may adopt or
> continue in force an additional or more stringent law,
> regulation, or order related to railroad safety or
> security when the law, regulation, or order – (1) is
> necessary to eliminate or reduce an essentially local
> safety or security hazard; (2) is not incompatible with
> a law, regulation, or order of the United States
> Government; and (3) does not unreasonably burden
> interstate commerce.

Id.

Where, as is the case here, a challenge on preemption
grounds involves a question of express preemption, the Supreme

Court and Third Circuit jurisprudence teach that an agency regulation with the force of federal law can preempt state law. <u>Wyeth</u>, 129 S. Ct. at 1200-01[18] (citing <u>Geier v. Am. Honda Motor Co.</u>, 529 U.S. 861 (2000); <u>Hillsborough County v. Automated Medical Labs., Inc.</u>, 471 U.S. 707, 713 (1985)); <u>Fellner v. Tri-Union Seafoods, L.L.C.</u>, 539 F.3d 237, 244 (3d Cir. 2008)).  Thus, the Court must next consider the extent of Pennsylvania common law's interaction with FRSA, and whether it preempts Pennsylvania common law.  <u>See</u> <u>Wyeth</u>, 129 S. Ct. at 1195; <u>English</u>, 496 U.S. at 78-79; <u>Bruesewitz</u>, – F.3d –, 2009 WL 792468, *5.

Federal Railroad Administration ("FRA") regulations address roadbed, track geometry, and track structure requirements in 49 C.F.R. § 213, Subparts B, C, and D, respectively.  Subpart B "prescribes minimum requirements for roadbed and areas immediately adjacent to roadbed."  49 C.F.R. § 213.31.  This includes a drainage requirement.  49 C.F.R. § 213.33.  "'Roadbed' is not defined in the regulations but the term commonly refers to the area under and adjacent to the tracks."  <u>Anderson v. Wis. Cent. Transp. Co.</u>, 327 F. Supp. 2d 969, 980 n.11 (E.D. Wis. 2004) (citing <u>Mo. Pac. R.R. Co. v. R.R. Comm'n of Tex.</u>, 653 F. Supp. 617, 624 (W.D. Tex. 1987), <u>rev'd on other grounds</u>, 833 F.2d 570

---

[18]    Although <u>Wyeth</u> did not deal with an express preemption provision, the Supreme Court reasoned that in the context of an express preemption provision a court must "perform its own conflict determination, relying on the substance of state and federal law . . . ."  129 S. Ct. at 1200-01.

(5th Cir. 1987), <u>cert. denied</u>, 507 U.S. 1050 (1993)).

Subpart C "prescribes requirements for the gage, alinement, and surface of track, and the elevation of outer rails and speed limitations for curved track." 49 C.F.R. § 213.51. Of particular relevance, title 49, Code of Federal Regulations sections 213.59(b) and 213.63 establish runoff standards.

Lastly, Subpart D "prescribes minimum requirements for ballast, crossties, track assembly fittings, and the physical condition of rails." 49 C.F.R. § 213.101. Ballast materials are governed under 49 C.F.R. § 213.103, including accommodating proper load distribution, stress levels, providing adequate drainage, and maintenance of proper surface levels. Subpart D also dictates turnout requirements. 49 C.F.R. § 213.133.

Under 49 C.F.R. § 213.2, regulations relating to "Track Safety Standards" are given preemptive effect by essentially mirroring 49 U.S.C. § 20106. <u>Id.</u> Section 213.2 provides:

> [u]nder 49 U.S.C. [§] 20106, issuance of these regulations preempts any State law, regulation, or order covering the same subject matter, except an additional or more stringent law, regulation, or order that is necessary to eliminate or reduce an essentially local safety hazard; is not incompatible with a law, regulation, or order of the United States Government; and that does not impose an unreasonable burden on interstate commerce.

<u>Id.</u>

The federal courts that have considered whether FRSA preempts state law in similar contexts have uniformly found in

-43-

favor of preemption.  See, e.g., Crabbe v. Consol. Rail Corp.,
2007 WL 3227584, *4 (E.D. Mich. Nov. 1, 2007) (concluding the
plaintiff's FELA claim for negligent use of improper or oversized
ballast in the defendant's rail yard was precluded by FRSA);
Biggers on Behalf of Key v. Southern Ry. Co., 820 F. Supp. 1409,
1421 (N.D. Ga. 1993) (FRSA preempted state law claims that
vegetation in roadbed and immediately adjacent to roadbed
obstructed motorist's view and caused train and car collision,
but did not preempt state law claims that vegetation near
railroad track obstructed motorist's view and caused train and
car collision); Norfolk & W. Ry. Co. v. Public Utils. Comm'n of
Ohio, 727 F. Supp. 367, 371 (S.D. Ohio 1990) (holding "state
regulation of walkways on railroad bridges and trestles is
preempted by the FRSA . . ."), aff'd, 727 F. Supp. 367 (6th Cir.
1991); Mo. Pac. R.R. Co. v. R.R. Comm'n of Tex., 823 F. Supp.
1360, 1361, 1367 (W.D. Tex. 1990) (considering state railroad
commission regulation mandating walkways in or adjacent to
roadbeds when law held preempted by FRSA); Norfolk & W. Ry. Co.
v. Burns, 587 F. Supp. 161, 169-71 (D.C. Mich. 1984) (holding
state law relating to tracks, roadbed, and walkways in rail yard
preempted by FRSA) cf. Norfolk S. Ry. Co. v. Box, – F.3d –, 2009
WL 322151, at *4-5 (7th Cir. 2009) (affirming district court
decision holding FRSA did not preempt state "adjacent walkway"
regulation because "no federal regulation deals with walkways.");

Anderson, 327 F. Supp. 2d at 980 (ruling that plaintiff's state law claim for failure to trim vegetation up to 330 feet away from roadbed was not preempted by FRSA).

The Court of Appeals of Indiana in Black v. Balt. & Ohio R.R. Co., dealt with a scenario similar to the instant case. 398 N.E.2d 1361 (Ind. Ct. App. 1980).  In Black, a plaintiff sued a defendant railroad company seeking to correct hazardous conditions at the defendant's rail yard.  Id. at 1362.  The complaint claimed "pumping actions in low joints, lack of good crossties, ballast and poor drainage created a muddy condition . . . ."  Id.  The court then conducted a review of FRA regulations relating to track roadbed, geometry, and structure.  Id. at 1363.  Specifically, the court pointed to regulations governing roadbed, drainage, vegetation, ballast, crossties, and rail joints.  Id.  In holding FRSA preempted the plaintiff's claim, the court stated

> [w]e do not feel that the mere absence of a specific regulation dealing with muddy conditions is sufficient to permit state action.  The fact that regulations have been adopted on those conditions that are alleged to have contributed to the situation around the track is sufficient.

Id.

State courts have similarly ruled in favor of preemption when the damage arises from a condition regulated by FRSA.  See, e.g., Mastrocola v. S.E. Pa. Transp. Auth., 941 A.2d 81, 91-95 (Pa. Commw. Ct. 2008) (holding plaintiffs' state law claim for negligent construction of temporary railroad track,

which caused a vibration that damaged plaintiffs' properties, was preempted by FRSA); Cart v. Mo. Pac. R.R. Co., 752 So. 2d 241, 243-44 (La. Ct. App. 1999) (finding FRSA preempted state law negligence claim for speed of train and condition of track because "[FRSA] regulations fully cover track maintenance, condition, inspection, classification and enforcement . . . [thus they] preclude the state from imposing its own classifications . . ."); cf. Hendrix v. Port Terminal R.R. Assoc., 196 S.W.3d 188, 201 (Tex. Ct. App. 2006) (rejecting argument that state law claim for unsafe rail yard walkway made up of too large and mixed ballast because FRSA did not promulgate regulation on walkways).

Plaintiffs cite two cases in support of the proposition that their state law claims are not preempted by FRSA.  Although the cases sympathize with plaintiffs whose claims are preempted by FRSA, each of the cited opinions held FRSA did preempt the plaintiffs' state law claims.  See Lundeen v. Canadian Pac. Ry. Co., 507 F. Supp. 2d 1006, 1013-17 (D. Minn. 2007) (dealing with derailed train that released toxic gas); Mehl v. Canadian Pac. Ry., Ltd., 417 F. Supp. 2d 1104, 1106 (D.N.D. 2006) (involving derailed train that released toxic gas).

Here, Plaintiffs allege that the artificially created runoff pattern from the railroad tracks and the area adjacent to the tracks and a failure to clean and maintain the sewage drains caused the flood.  Specifically, Plaintiffs claim the water

-46-

accumulated because the sewage drains that serve the intersection were clogged with as much as one foot of mud and ballast on the date of the storm.  As a result, the water flooded the adjacent area thereby causing extensive damages to Plaintiffs' properties and businesses.

Plaintiffs first take issue with the artificially created runoff pattern at the Bridge and the area adjacent to the tracks.  The standards for runoff patterns are addressed directly under 49 C.F.R. §§ 213.59(b) and 213.63.  Second, Plaintiffs allege a drainage problem at the Bridge and the adjacent tracks, which clogged the sewage drains with mud and ballast.  The standards for roadbed and areas immediately adjacent to the roadbed are established under 49 C.F.R. § 213.31.  Drainage requirements are governed under 49 C.F.R. § 213.33.  Moreover, minimum requirements for ballast and physical condition of rails are provided for under 49 C.F.R. § 213.103, ballast materials are governed under 49 C.F.R. § 213.103, and turnout requirements are set forth under 49 C.F.R. § 213.133.  Since FRA regulations cover the subject matter at issue, Plaintiffs claims are preempted by FRSA unless Pennsylvania has "an additional or more stringent law" that "(1) is necessary to eliminate or reduce an essentially local safety or security hazard; (2) is not incompatible with a law, regulation, or order of the United States Government; and (3) does not unreasonably burden interstate commerce."  49 U.S.C.

§ 20106.

Plaintiffs cannot point to any Pennsylvania regulation or common law, which would take the instant situation outside the scope of the FRSA.[19]  For the foregoing reasons, Plaintiffs' claims are preempted by FRSA.

c.   Complete preemption doctrine

In the alternative, Plaintiffs argue that their state law claims are not preempted by FRSA under the complete-preemption doctrine.[20]  "[W]here there is complete[-]preemption of a state law claim the result is 'to convert complaints purportedly based on the preempted state law into complaints stating federal claims from their inception.'" In re Cmty. Bank of N. Va., 418 F.3d 277, 290 (3d Cir. 2005) (quoting Krispin v. May Dep't Stores Co., 218 F.3d 919, 922 (8th Cir. 2000)).  This

---

[19]     The Supreme Court explained that "reliance on the common law [is] 'incompatible with' FRSA and the Secretary's regulations." CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 675 (1993).  Furthermore, local standards beyond those promulgated by FRA would thwart FRSA's goal of achieving uniform, national standards for railroad operations.

[20]     The Court recognizes that Plaintiffs' reliance on the complete-preemption doctrine is unusual under these circumstances for two reasons.  First, preemption is ordinarily a defense to a plaintiff's suit. Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 63 (1987).  Second, the complete-preemption doctrine is generally raised in the context of removal. Id.; see, e.g., Vanden v. Discover Bank, – S. Ct. –, 2009 WL 578636 (2009); In re Cmty. Bank, 418 F.3d 277; Guckin v. Nagle, 259 F. Supp. 2d 406 (E.D. Pa. 2003) (J. Robreno).

is so because "[o]nce an area of state law has been completely
preempted, any claim purportedly based on that preempted state
law is considered, from its inception, a federal claim, and
therefore arises under federal law."  Catepillar Inc. v.
Williams, 482 U.S. 386, 393 (1987); accord Pascack Valley Hosp.
v. Local 464A UFCW Welfare Reimbursement Plan, 388 F.3d 393, 399
(3d Cir. 2004).

        Here, Plaintiffs argument that the complete-preemption
doctrine is not applicable is directly contradicted by their own
admission and one of the cases upon which they rely, Hunter v.
Canadian Pac. Ry. Ltd.  Civ. No. 07-3314, 2007 WL 4118936, *1 (D.
Minn. Nov. 16, 2007) (considering a train and vehicle crash).
First, Plaintiffs state "Congress has expressly provided that
there is no exclusive federal cause of action that would
encompass [their] claims."  Pls.' Resp. to AMTRAK's Mot. Summ. J.
14 (doc. no. 83).  Second, Hunter clearly recognized that
Congress clarified the preemptive effect of 49 U.S.C. § 20106,
rendering the complete-preemption argument inapplicable.  Id. at
*4.  In particular, title 49, United States Code, section 20106

> no longer preempts actions filed under state law
> seeking damages for personal injury death or property
> damages in cases where a plaintiff alleges that a
> railroad has failed to comply with federal standards of
> care, its own safety standards, or state laws that do
> not directly conflict with a federal regulation.

Hunter, 2007 WL 4118936, at *4 (citing 153 Cong. Rec. H8496-01,
at *H8590 (daily ed. July 25, 2007)).  In other words, Congress

explicitly provides an avenue in which plaintiffs can file claims
that fall outside the ambit of FRSA.  Since complete-preemption
does not apply to the facts of this case, Plaintiffs' argument
fails.[21]


          2.   Whether AMTRAK is liable for negligent maintenance
               or construction of the sewer system

        AMTRAK contends that the evidence obtained during
discovery does not prove that it constructed or was responsible
for the maintenance of the sewer system, as alleged in
Plaintiffs' complaint.  Since Plaintiffs bear the burden of
persuasion, they are obligated to point to evidence on the record
which raises a genuine issue of material fact that AMTRAK owns,
constructed, or is responsible for the maintenance of the sewer
system.  See Estate of Zimmerman, 168 F.3d at 685.[22]

---

        [21]   The Court need not address whether the storm was an
"Act of God" under Pennsylvania law because Plaintiffs' claims
are preempted by FRSA.

        [22]   As discussed above, the prima facie elements for a
negligence claim are: (1) a duty or obligation recognized by law;
(2) a breach of that duty; (3) a causal connection between the
defendant's breach of the duty and the resulting injury; and (4)
actual loss or damage suffered by the plaintiff.  Cooper, 960
A.2d at 139 n.2.  Failure to establish one of the elements for a
negligence claim is valid grounds to grant summary judgment.
McMahon, 952 A.2d at 735.

        "[T]he existence of a duty is a question of law for the
court to decide[.]" Cooper, 960 A.2d at 143 (quoting Commerce
Bank/Pa., 911 A.2d at 137.  A defendant must own or control the
property that caused the plaintiff's injury before a duty is

Here, the City acknowledges ownership and
responsibility for the maintenance of the sewer system at issue.
Specifically, Plaintiffs state that "some of the evidence
obtained as a result of discovery revealed that [the City] owns,
constructed, maintain and/or controlled the storm sewer drain [at
the intersection]."  Pls.' Resp. to AMTRAK's Mot. Summ. J. 10
(doc. no. 83).  Plaintiffs then discuss evidence relating to
AMTRAK's interest in the Bridge and the adjacent track, not the
sewer system.  Plaintiffs' attempt to obfuscate the issue is not
helpful and its brief on this point is non-responsive.  Thus,
there is no genuine issue of material fact over ownership and
responsibility for the maintenance of the sewer system.
Accordingly, Plaintiffs are precluded from moving forward under
this theory at trial.

III. CONCLUSION

For the reasons set forth above, (1) the City's motion
for summary judgment is granted in part and denied in part; (2)
SEPTA's motion for summary judgment is granted, and SEPTA is
dismissed; and (3) AMTRAK's motion for summary judgment is
granted, and AMTRAK is dismissed.  Under this ruling, only

---

imposed.  See, e.g., Snyder, 562 A.2d at 312-13 (granting
immunity when dangerous condition did not involve the defendant's
property); Donnelly, 708 A.2d at 149 (requiring injury be "caused
by the *government realty itself* . . . ."); CSX, 630 A.2d at 935
(requiring "title, ownership, physical possession or actual
control over the real property in question.").

Plaintiffs' negligence claim against the City may proceed to trial.